and parents for Megan's Law Incorporated. Good morning, your honors. My name is Erin Beth Harris and I represent the plaintiff appellant in this matter. The central issue in this appeal is whether the immediate objective of the Suffolk County Home Verification Program is to gather incriminating evidence from sex offenders for potential prosecution for failing to register, which is a felony offense under New York Correction Law 168-T. I believe that the record demonstrates that this is, in fact, the immediate purpose of this program is law enforcement. And I think the facts that I would point... Why isn't it verification? Your client is required to register and what this visitation to his home does is verify that the registration information he's provided about where he's residing is accurate. Well, your honor, I think it would be appropriate were what these engagements were, were knock and talks. But what they are is, in fact, coerced questioning of potentially incriminating questions given the fact that failure to register properly is a felony offense. You're assuming that the registrant is not providing the accurate information. I mean, in the vast majority of cases, the verification will turn out to be accurate. It would have been accurate in your client's case. And the point of that is so that, or this is the legislative decision, that members of the community will know when there's a sex offender living in the neighborhood. So that's why it's important to get verified information. And the fact that there's the possibility that if someone lies or something else happens, there could be criminal consequences, the courts have not been persuaded that that's enough to find that its main purpose is criminal prosecution. Well, I think it's important to note, though, the nature of these interactions is coercive. People are led to believe that they're required to comply with the questioning that's happening. That's the question, right? Well, that's the question as to whether a seizure is occurring at the front door, which is, of course, the most protected area in the Fourth Amendment. The court here was willing to assume that that was the case. That is correct. She found that there was a material issue of fact. Assuming that, yes, she found there was a question of fact. So assuming it for purposes of summary judgment, though, she found that the inquiry was reasonable. That's the issue you're challenging on appeal, right? Correct. Okay. But to get back to what the special needs test looks to is to whether it is about gathering incriminating information. It wasn't just to follow up on Judge Radji's questions, though. It was to find whether the addresses were accurate that were on file. And over a three-year period, hundreds of these inquiries occurred, and only 19 people were prosecuted. So doesn't that show that they were just trying to make sure that the people who lived in the county would know where these people were living, where the sex offenders were living, so the addresses were correct? Not necessarily to prosecute all those people. Why is that wrong? Well, first I would note that in cases where special needs have been found, there have been zero arrests. And I'd point the Court to Nicholas v. Gord, as well as this Court's decision in Lynch v. City of New York. Here there are 19 arrests, which I think is highly probative of what the immediate purpose of this program actually is. Out of how many confirmations, though? How many people were visited? Well, there's approximately 1,000 people on the registry in Suffolk County. And they go once a year for some of them and twice a year for others. And to get to the point again about how this is really about gathering incriminating information, the phrase that PFML uses for determining the success of the program is how many felony leads it generates. So in the first year there were 173 failure to register home address felony leads, which I think is highly probative of what the immediate purpose of this program actually was. And I think one of the flaws of the District Court's opinion was that she omitted, she failed to note that the DA is very closely involved with this program. They made sure that the forms in which this information is gathered could be used for evidentiary purposes. And she did not note that or assume it is true for the purposes of the defendant's summary judgment motion. Tests for special needs is what the point of a warrant would be. So in this case, they're going to verify that every person who's provided their address has provided accurately what. They're going to have to go to a judge in every case and say he's a sex offender, he says that this is his address, and we want to confirm it. Well, I think that the purpose of the warrant requirement is to ensure that people are aware of what the proper scope of an inquiry is. Here we have people going to the door, my client is a level one, doesn't need to report his employment, but they asked him about that anyway. They went far beyond the scope of what my client is actually required to report to the registry. Can I just ask you about the injunction aspect of this, though? He's now served his sentence, right? I'm sorry, he's completed his term under SORA, right? That's correct, Your Honor. So how is future relief available to him? Well, this is about damages, Your Honor, and simply compensatory damages for the emotional harm that he and his family experienced. So you're not pursuing the injunction aspect of this, is that right? That's correct, Your Honor. We no longer have standing for that as he is no longer on the registry. Well, let me ask you, is there any question that a warrant would issue in these circumstances when you talk about damages that a judge wouldn't find that they could go and verify his address? The whole problem with this program is that it's a suspicionless program. Oh, so you want probable cause for what? Probable cause to engage in a short detention. Even on the street, you're required to have reasonable suspicion to engage in a short detention. This is on the doorsteps of his home. So you think they need reasonable suspicion to think that he's lied about his address? In order to conduct a compelled interrogation, yes. In order to ask him to confirm it. In order to coerce him to confirm it, yes. What's going on here is that you can send in your address, you can even come down to the police station and say what your address is, but until there's a home visit, it's not confirmed. How do you want them to confirm it consistent with the Fourth Amendment? They could engage in knock and talks, Your Honor. Knock and talks? What Justice Scalia describes as a knock and talk in Florida v. Hardines, which is what all members of the public are able to do, go to the door and ask for information. But that's not what's happening here. If they wanted to develop that program, What's happening that's different from what you're calling a knock and talk? They send a letter saying you're required to comply. And that's not something that people do, regular visitors, trick-or-treaters. These are Justice Scalia's examples when they go to the door. And that's sent by the police department, right? That's correct. The people you're suing are the County of Suffolk parents for Megan's Law. You're suing the private organization, right? Well, they worked with the Suffolk County Police Department to send the letter because registrants were not cooperating with the program. And this gets to another problematic part of this program, which is that the police department actually had a policy of not telling people that compliance was voluntarily unless people asked repeatedly. And what happened to our client is confirmed in that regard because they called the police department and said, do we need to comply? And they were told to answer the questions. Compliance with the private organization was voluntary. If you didn't provide the information to the private organization, you were going to get a visit from the police department, right? That's correct. That you don't dispute could happen, right? I don't dispute that a knock and talk could be engaged in where you go to the door and request information. Let me ask you this, given that if I understood you correctly, you're saying that the letter is the crux of the problem, but the parent's organization is responsible because they asked the police to send the letter, right? Well, parents for Megan's Law, the district court engaged in a long state action analysis to determine that they are functioning as the state in this instance. I have a new position by the Supreme Court this week on private actors as state actors. Do you want to comment on how, if at all, that supports or undermines your position? Sure, Your Honor. That case, to my understanding, was about whether public function, whether the function that the private entity is serving is a traditional and exclusive function of the government. The district court here ruled on two different grounds that there was state action here. One, that the police department and the parents for Megan's Law are closely engaged. They're jointly entwined in this intrusive conduct, and that it's a public function. And here I think that there is a difference between that case, because that case, which was about public access TV, had been, since its beginning, there have been private operators involved. That was my understanding. Whereas here, since the registry was created, local law enforcement has been given the task of enforcing that law. And so I still think that the court's conclusion, that parents for Megan's Law is engaged in a public function, applies here. And if I could just make one further point about the immediate purpose of this program, it's the state's burden to show that it's not law enforcement. The Division of Criminal Justice Services is the agency that, in fact, maintains the sex offender registry. There is nothing in the record that shows how this corrected information actually gets there. What we do know is when incriminating information is found, within 24 hours it's sent to the police department for follow-up and enforcement. And this, I think, is really very similar to what was going on in Ferguson, where they had a laudable goal, verifying the registry, laudable goal. But you can't do it by unconstitutional means. And there, how it was improving maternal health and well-being was not clear at all from the policy. Likewise, I think here, the record is devoid of any information regarding how this corrected stuff gets to the Division of Criminal Justice Services. Thanks very much, Ms. Harris. Thank you, Your Honors. I'm going to reserve some time. And I've given you some extra time, of course. Counsel for Suffolk County. Good morning, Your Honors. May it please the Court. My name is Dana Kobos from Suffolk County Attorney's Office for the County of Suffolk. The District Court was correct in its analysis that had a seizure occurred, the special needs exception to the Fourth Amendment warrant requirement applied, and in balancing the special need against the plaintiff's privacy interest, the seizure was reasonable and did not violate the Fourth Amendment. So you have no trouble with the predicate concept that the PFML is a state actor? In your view, you would prevail anyway? Yes. Yes, Your Honor. We would hold it as a state actor, but there was nothing wrong with the particular search? Correct. Yes. The reason why the Community Protection Act was passed was because prior to February of 2013, Parents for Megan's Law was getting complaints that the sex offender registry was not accurate. And there's really no point in having a sex offender registry if it's not an accurate registry. So in order to facilitate ensuring that sex offenders were actually at the addresses that they claimed to be, this act was passed and Parents for Megan's Law contracted with the County of Suffolk in order to perform these checks. The primary purpose of the verification program was to ensure the accuracy of the registry. It was not for law enforcement purposes. This is entirely different from Ferguson, where pregnant women went into a hospital to get prenatal care, were given urine tests without their consent, the results of these tests were distributed to the police department, and then they faced arrest based on those tests. These are people who know they have to register, are being visited in very brief, non-confrontational visits by Parents for Megan's Law, and are asked to provide their addresses. They're asked to look at their license. That's basically it. They're there for two to five minutes, and they're on their way. That's what the policy is about. It's a situation where police officers have to submit to a breathalyzer test after their weapon is discharged. And although it hasn't happened that a police officer actually was prosecuted as a result of the breathalyzer test, that doesn't mean it can't happen, and that doesn't mean that that's the reason and the primary purpose of that policy. It's a similar thing here, where the primary purpose is to maintain an accurate sex offender registry, to prevent recidivism, which maintaining an accurate registry has been shown to do, and to prevent future crime. Can I ask you about the seizure aspect of it? The district court said it was a question of fact, and didn't need to be resolved, but how could there be a question of fact about there, given all the undisputed facts about the Hernandez letter? These are former police officers exclusively that are performing these checks. They have identification badges. They go up and they say, could you please step out of your house? We want to see your driver's license. How is that not a seizure, even a limited one? I think in looking at the factors, like the Lee factors, for example, where these people were in plain clothes, not in a marked car. They go up, they do a knock and talk, basically. The letter, by the way, was not for the purpose of saying we're coming to get you. The letter was because parents for Megan's Law, their own people were getting attacked at certain occasions by people who were releasing dogs on them or other instances, and that's why the letter went out. Sex offenders are required to provide this information. It kind of sends a signal like you better answer these questions and be nice to these former police officers when they go to your house. I can see how somebody could potentially think that, and that's, I guess, why there is a question of fact as to whether or not that's the case. But I just want to note that if the purpose of this program was for law enforcement, there were 253 referrals that were made to the police department in the first 18 months of this program, and only 19 arrests were made. In the first year alone, Parents for Megan's Law conducted 2,640 verification attempts of 1,353 sex offenders and only made 173 referrals. And the forms that are used for these visits, when you check off the forms, they don't say this person is in violation of a crime. They say this person may have failed to register, or this person may have violated the registry. How could that be used as evidence? You need probable cause after that. These referrals were made to the police department, and then it was up to the police department to then determine whether or not there was probable cause to prosecute, and apparently this only occurred in 19 cases. So the primary purpose is clearly not law enforcement. The primary purpose is to maintain an accurate sex offender registry. Would you give us, before you sit down, your description of what the seizure was here, if it is that? What exactly happened? So what happened was there were two occasions where Parents for Megan's Law visited this particular person's home. The first time was in August of 2013, I believe. At that time, they knocked on the door. His wife answered the door, and he was in the shower. She did not ask them to leave at any point in time. They waited on the sidewalk in front of the house. The block? Is that what you said? The sidewalk. Mr. Jones, yes. So far it's a knock and talk, right? Yes. Mr. Jones eventually came down after his shower, spent about two minutes, two to five minutes, I think he said, with these people, showed him the license. At the door? I think he actually went to his car, which was parked on the street, retrieved his license, which was in his car, showed them the license, and that was it. The second time... All of this taking place on the sidewalk? Well, I think one person followed a couple feet behind him to his car, which was parked on the street, and that was, I believe, when he showed them the license. You know that the claim is that you can't look at that without looking at the letter, and it was the letter that made him think that this whole encounter was required rather than voluntary. So don't we have to put that fact in first, that first he got the letter? I think he and his wife testified that they'd seen the letter. I think the letter occurred after his first, the first visit. The first visit you're saying happened without, before the letter? I believe so. I believe there was the visit, then the letter, then the second visit, although I could be wrong.  How much later? A year later. He answered the door. Same thing happened. He went to his car. He got his license. He even joked around with the Parents for Megan's Law representatives about his license picture. Clearly did not feel threatened. It lasted two to five minutes, and again, the Parents for Megan's Law was on their way. In your view, that's also a knock and talk? Yes. In each case, the conversation is taking place on the sidewalk, but the second visit postdated the letter. Yes. I know that you're hesitating a bit, so feel free to submit by tomorrow at five o'clock any letter that you think appropriate to just give us the sequence of events and relying on the record as you think appropriate. Assuming there's no other subject for such a letter, we'll ask opposing counsel to respond by no later than Friday, February 21 at five p.m. All of this to be done electronically. On this point, if it helps your memory, I thought that the wife said that after receipt of the letter, she called the Suffolk County Police to ask if they had to abide by this letter. According to her, the police told her that her husband should answer questions and not be rude to the people from Megan's Law. I had somehow assumed that all took place before there was any encounter. Does that help you remember any better? I am not 100% sure, but I don't know if my colleague from Parents for Megan's Law might be able to clear that up. Mr. Saviardo has five minutes now. Good morning, Your Honors. I'm Mauricio Saviardo from the Parents for Megan's Law. I think my co-defendant's counsel has appropriately addressed the larger issues. What I would like to do is just focus on a couple of key things in the record to bring to the Court's attention that I think will help guide his decision. The forms that are at issue here with which the ACU has issued are located on page 1384 of the record. Here are the pertinent questions that the Parents for Megan's Law folks answer when they're submitting their forms. The resident, one, may have failed to register as requested. The resident may have violated conditions of supervision. The resident may have violated residency restrictions. The resident refused to cooperate with address verification, or we were unable to confirm for reasons provided. Now, contrary to what the ACLU is arguing, if this form was created by a district attorney for the purpose of gathering evidence to prosecute crimes, they should be fired, because there is no way that this information can lead to a probable cause finding to support an arrest. The argument is that it's the first step, at least the first three questions, or first three possible disclosures you identify, could result in the police finding out if there's been a violation. This is the trigger, as I understand it. Well, that's correct. It's not the basis for any arrest or any prosecution. It's the form would be the follow-up, as testified to by Lieutenant Hernandez, that if they get a tip and they open a file, they go out and then they confirm. And it's that information that may be used. This information that someone may have failed to register is not a crime. It's not probable cause or evidence to support a probable cause finding. Your Honor, you were good enough to refer to the page in the appendix, which of course has many volumes. What page was that? That was at 1684, Your Honor. 1684. Bear with us a second. That's Volume 7 of 12. Give me the number again. 1684. Don't worry, I'll give you more time. The clock is not running. 1684. The last page of the penultimate page. Now help us. 1684, what do I see here as far as you're concerned? The list of questions is three-quarters of the way down through the page where the court is going to check off this information. That's the information that they're checking off. One of them in this particular case is checked, may have violated residency restriction. Correct. And what I'm trying to bring to the court's attention . . . You don't think that's part of a law enforcement function? It's not a primary purpose. Because if the primary purpose was, as the ACLU is arguing, is to gather information to prosecute these registrants for failing to comply with SORA, there would be other information that you would have to establish. Just because someone may have failed to register doesn't necessarily mean they committed a crime. There can be many reasons that are not criminal as to why the person hasn't registered yet. You also have may have violated conditions of supervision, may have failed to register as required. All of those involve, in the nature of things, penalties, right? I don't think there's any. There's no penalties imposed. They're providing the police with a tip as to who may need additional follow-up. Any additional follow-up is conducted by the police. The parents of Megan's was not even notified if the police would go back. We have no idea if the police take any further action on the information provided. This is just the first step in trying to comply with the primary purpose of verifying the information. Somehow, I mean, I have a sense as I look at this and as I listen to you, that parents for Megan's law is an integral part of the law enforcement functions of Suffolk County and is a state actor of some kind. It's certainly an arm of, it's designed to be an arm of the law enforcement apparatus of Suffolk County. Now it may be that the particular search here is without fault, but I don't see how it could be anything other than state action. The inquiry becomes whether it's the primary purpose. And the primary purpose goes back to... That's after you're found to be a state actor. Correct. You're willing to accept at least for purposes of state actor status. Correct, because the decision of the district court by Judge Seibert would be affirmed on the basis that what was done was reasonable and the societal interest at our stake here outweighed the minimal nature of the intrusion. We'll rest on our brief on the remaining issues. Thank you for your time. Let me ask you a clerical question, if I may, just to make sure we have these records straight. Are you part of the law firm with these very long names, Miranda, Samborski, Sloan, Sklaren, Veranoitis? Yes, I am, Your Honor. All right, thanks. And you've entered an appearance and you're a member of the Bar of the Court. I have, yes. Thanks very much. All right. Ms. Harris. Thank you, Your Honor. A couple of things I'd like to clarify. The record is clear that they received the letter prior to the first visit. As a result of receiving the letter, they called the number at the bottom of the letter, which was to the PD, and they said, do we need to comply with this? And they were told... Do you have a brief site if we're looking to confirm what you're just telling us? I don't have it in front of me. Can you provide it on the schedule Judge Cabran escaped? I certainly can, Your Honor, and I'm happy to do so. And another point I'd like to point out, there's really no question, there's this use of the word sidewalk. There's actually no sidewalk in front of his home. He's referring to the walkway and the testimony that goes right up to his front porch. And I'd like to be clear that Justice Scalia, again, in Florida v. Jardines notes that the front porch is the exemplar of the curtilage, where you have heightened protections from visitors who are exceeding the implied license to approach the home. Well, this is what you're describing as a my ancestral borough of Queens. You don't have sidewalks. Is that what you're saying? That's correct. When he said sidewalk, it's his private walkway. We have sidewalks in Queens. So there's a problem here, right? I mean, where are they supposed to stand, there being no sidewalk? I'm just trying to say that they're walking up his private walkway onto his step. Yes, but what else is there? Can you describe physically what the environment presents? Yes, and in fact, there is a picture of the home. As soon as they get off his property, they're in the street. No, that's not actually true. There's a yard. There's a yard. You can walk up the driveway, and there's a walkway that goes along the side of his house up a couple of steps. And you're okay with the yard? No problem if they come out and talk to him in the yard. Well, I think that there's a question as whether that's a curtilage question, but it's clear that they were on his steps of the front porch. But I would like to go back to... Where does the curtilage end? Well, at least we can assume that the curtilage includes his entire front porch, including the steps that these officers were standing on. Okay. And I just want to go back to this point about the forms being used as evidence. Perhaps the Suffolk County Police Department was stupid for using these forms as evidence, like my opposing counsel suggests, but the officer in charge of this program testified that the forms were created in consultation with the district attorney's office. We cite to this explicitly in the brief, so they could be used as evidence. And in fact, their own 30B6 witness testified that they needed to make sure the forms were proper for evidentiary purposes. We have those citations in the brief, and so it is clear that these were used for evidence, and therefore bear a lot of resemblance to the case of Ferguson and not like the case in Lynch. And I just want to note as well that just like in Ferguson, this is incriminating evidence. It might not be sufficient, but that's not what the special needs test is asking for. It is incriminating evidence that is going from these private entities to the police department for follow-up and enforcement. And I just want to note as well, despite being explicitly asked, we still have no information about how this gets to the Division of Criminal Justice Services. And so I just find it hard to... And what is your theory on that? My theory is that that just demonstrates that the primary purpose is not to correct the registry because that is the entity that maintains the registry. Well, that's your response to counsel's primary purpose argument. Correct. And they have not once tried to say how it actually gets there. Let me ask you. I don't understand you'd be arguing that verification is not a permissible goal here. Would you be satisfied with a program that sent a letter that said these people are authorized so that others don't, you know, have their dogs go after them or whatever, but that added a sentence that said you do not have to speak to them. If you choose not to speak to them, a police officer will visit your home. I mean, are you satisfied with that? I'm just trying to figure out how do they achieve the legitimate verification goal without causing the Fourth Amendment concerns you identify. I think that's exactly how, Your Honor. I think they need to be clear that compliance is not required and they can engage in a program of knock and talks. And in fact, the Suffolk County Police Department seemed to have been doing that for several years before this private entity got involved. And so that is a program that's very likely permissible under the Constitution. So you say that they might very well be willing to do something like that, that you're suing for damages. Do you have any expectation of anything more than nominal damages in your client's case? I think it would depend on the testimony regarding the emotional harm. You know, his family was there that day that created emotional harm for him and his family. But, you know, whether damage is huge in this case, no, Your Honor, they are probably not. It's the constitutional injury that is really at issue here. And unless there's any further... Any attempt to settle along the lines of getting some kind of change in the letter? It seems rather modest. And just achieving that, if that's the concern here. They don't want people siccing their dogs on these folks. And you want people to know that they don't have to answer the questions if they'd rather speak to, you know, a police officer. There were attempts to do so. They were not successful. Thank you, Your Honor. Thank you very much. We'll reserve the decision. We thank you all for your arguments very much.